# Illinois Official Reports

## Appellate Court

---

### *People v. McCoy*, 2016 IL App (1st) 130988

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CARL McCOY, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-13-0988 |
| Filed | September 15, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-613; the Hon. Diane Gordon Cannon, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, Patricia Mysza, and Gabrielle Green, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Peter D. Fischer, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE BURKE delivered the judgment of the court, with opinion.[*]<br>Justice Lampkin concurred in the judgment and opinion.<br>Justice Gordon specially concurred, with opinion. |

---

[*]This case was recently reassigned to Justice Burke.

**OPINION**

¶ 1      Following a jury trial, defendant, Carl McCoy, was convicted of the first degree murder of Woodrow Culverson and sentenced to 50 years in prison. He appeals, arguing (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the State committed reversible error by asking during cross-examination whether he threatened to kill Culverson's family if Culverson told police that defendant shot him, where the State had no basis to ask that question and there existed no possibility of proving up that accusation; (3) the trial court should have admitted statements Culverson made to a paramedic on the scene as either dying declarations or excited utterances; and (4) the court erred by allowing the State to use defendant's prior attempted first degree murder conviction for impeachment purposes.

¶ 2      We agree with defendant that the State's improper accusation during cross-examination and the admission of defendant's prior attempted murder conviction were reversible errors. Because we find the evidence was sufficient to sustain defendant's conviction such that retrial would not violate the double jeopardy clause, we reverse and remand for a new trial.

¶ 3                          I. BACKGROUND

¶ 4                           A. Pretrial

¶ 5      In December 2008, a grand jury returned an indictment charging defendant with, *inter alia*, the first degree murder of Culverson.

¶ 6      Prior to trial, defendant filed a motion *in limine* seeking to admit statements that Culverson made to Chicago fire department paramedic Heather Spalliero as dying declarations or statements made for the purpose of medical diagnosis or treatment. Defendant's motion alleged that Spalliero treated Culverson at the accident scene and when she asked Culverson if he had been shot, he said no. She then asked if the driver shot him, and Culverson said no.

¶ 7      At an initial hearing on the motion, defense counsel explained that case law regarding dying declarations established that "[i]f the declarant believes that they are in dire health about to die and they make a statement, the truthfulness of the statement is such it should come in under [the] hearsay exception." The trial court responded as follows, "I understand. In this case we have the opposite. Not only did he not think he was shot, what makes you think that he felt he was going to die if he didn't even admit that he was shot?" Counsel acknowledged that Culverson's apparently incorrect response to the first question posed "a bit of a problem." However, counsel posited Culverson could have believed he was dying based not only on the shooting but also on the fact that he was in a bad car accident. The court initially denied defendant's motion. However, defense counsel asked the court to reserve its rulings for counsel to bring emergency medical technician (EMT) Spalliero to court to testify, and the court agreed.

¶ 8      At a later hearing, Spalliero testified that she came into contact with a car accident on 6440 South Martin Luther King Drive on August 30, 2008. She did not have an independent recollection of her encounter, but she reviewed her report before testifying. In her report, Spalliero indicated that Culverson was alert and oriented to person when she came into contact with him. Her report indicated that Culverson had gunshot wounds in his lower abdomen. His breathing became labored, and he complained that he could not breathe. Spalliero asked

Culverson whether he had been shot, and he said no.[1] Spalliero administered cardiopulmonary resuscitation (CPR), and Culverson lost consciousness about 11 minutes after Spalliero came into contact with him. The State asked Spalliero the following question: "And you never told Mr. Culverson that he was going to die soon, did you?" to which Spalliero responded, "There's no way I can know that for sure." Spalliero testified Culverson never told her that he thought he was going to die soon.

¶ 9    The trial court denied defendant's motion *in limine*, finding Culverson's statements did not fall into the dying declaration exception, as Culverson was alert and oriented and died after being placed in the ambulance. The court also found the statements did not fall into the excited utterance exception because Culverson made his statements in response to Spalliero's questions. Furthermore, the court stated, "the reliability [was] questioned" because Culverson had an obvious gunshot wound to his abdomen and was either unsure of the question or was unaware of the fact that he had been shot. The court stated it did "not believe that there is reliability, nor is there a situation where the statements were made to assist the police in their investigation of getting a known offender off the streets."

¶ 10    Also prior to trial, the State filed a motion to allow proof of defendant's prior attempted murder conviction, for which defendant received a 10-year prison sentence in 1999, for impeachment purposes. Defendant objected, arguing the jury should hear only that he was a convicted felon but not that his conviction was for attempted murder. Stating that it had weighed the probative value of the evidence versus its prejudicial effect, the court ruled that if defendant elected to testify, his conviction could be introduced as a conviction of attempted first degree murder.

¶ 11                                                    B. Trial
¶ 12    In December 2012, defendant's jury trial commenced.

¶ 13                                          1. *The State's Evidence*
¶ 14    Linnetta Culverson testified that she and Culverson were married for seven years. Culverson owned a 2002 pearl white Park Avenue, which he loved. Linnetta, Culverson, and Culverson's sister, Latunya, attended a party at a family member's home on August 30, 2008. Culverson "did a little drinking." The three left the party at around 8 p.m. in Culverson's Park Avenue. Culverson dropped Linnetta off first at their home at 5313 South Wallace Street. He then departed in his car at around 8:20 p.m. to take Latunya home. Linnetta thought Culverson intended to return home after dropping off Latunya. When asked whether she believed that Culverson was going to his brother's party after taking Latunya home, Linnetta said she "wasn't aware of it." Linnetta did not notice anything unusual about the way Culverson was acting or driving. She had never met defendant and did not know whether Culverson knew defendant.

---

[1] We note that defense counsel did not ask Spalliero about Culverson's statements. On cross-examination, the State elicited from Spalliero that when she asked Culverson if he had been shot, he said no. However, Spalliero was not asked whether she asked Culverson if the driver shot him. Nonetheless, the State did not dispute in the trial court, nor does it dispute on appeal, that Spalliero asked Culverson whether the driver shot him and he responded, "no."

- 3 -

¶ 15        Latunya Culverson testified that Culverson dropped her off at her home at 827 East Bowen Avenue at around 9 p.m. on August 30, 2008. After walking Latunya inside and talking to Latunya's son, Antione, Culverson departed. Latunya believed that Culverson was planning on going to his brother's home afterward. When asked where Culverson's brother lived, Latunya responded, "62nd—I am not quite sure. I don't know the direct address, but I know it is on Normal." Latunya did not know whether Culverson knew defendant or ever let defendant drive his car.

¶ 16        Antione Thompson, Latunya's son, likewise testified that he did not know whether Culverson knew defendant or ever gave him permission to drive his car. Culverson drove Latunya home on August 30, spoke to Antione, then departed. Thompson believed Culverson was going to his brother's house.

¶ 17        Patience Mays testified that she was driving near 67th Street and Martin Luther King Drive at around 9:25 p.m. on August 30, 2008. From her rearview mirror, she saw a car run into a pole. The car had previously tried to pass her as she was driving along Martin Luther King Drive.

¶ 18        Mays made a U-turn and pulled up to the side of the car. Inside, she saw two men. One was sitting in the passenger's seat and the other was getting out of the driver's seat. The two men appeared to be conversing because their hands were moving as if they were talking. Mays did not hear the driver or the passenger screaming.

¶ 19        Mays asked the driver of the car whether he was okay, and he started retrieving items out of the car, like a jacket and a bottle. Mays did not see him grab or throw a gun. She also did not see if anything was tucked into his waistband or if he had anything in the jacket he grabbed. The driver threw the bottle and told Mays that he was okay. Mays offered to call somebody. The driver instructed her not to call the police but to call the paramedics. Thereafter, the driver "took off running" toward a viaduct. The passenger of the car never screamed for help, and the driver never instructed Mays to tell the paramedics that the passenger had been shot.

¶ 20        After the driver ran away, Mays pulled over to the other side of the street and called 911. Mays drove away when the fire department arrived. She did not speak to the paramedics or police before leaving the scene.

¶ 21        The parties stipulated that if called to testify, deputy medical examiner Dr. Valerie Arangelovich would testify that she performed an autopsy on Culverson on August 31, 2008. She would testify that she observed two gunshot entrance wounds on the lower left side of his abdomen. She would opine that Culverson died of multiple gunshot wounds and that his manner of death was homicide. There was no evidence of close range firing with respect to either entrance wound. She would also note that Culverson had a laceration on the palm of his right hand.

¶ 22        Chicago police officer Joseph Bokuniewicz testified that he and his partner, Officer Adamski, received a call to go to the area of 6640 South Martin Luther King Drive at around 9:30 p.m. At the scene, Bokuniewicz observed a light-colored Buick Park Avenue crashed into a light pole. Both air bags were deployed and blood was on the seats. No one was in the vehicle by the time Bokuniewicz arrived.

¶ 23        Forensic investigator David Ryan testified that he arrived at the scene at around 11:30 p.m. He noticed a 2002 Buick Park Avenue that had struck a light pole. Ryan conducted a

walk-through of the scene, looking for firearm evidence or other physical evidence. Ryan's partner also videotaped and photographed the scene.

¶ 24 Ryan testified that he and his partner recovered the deployed air bags from the driver's side and passenger's side. Ryan explained that skin cells can be obtained from deployed air bags. Ryan observed blood on the front passenger's seat cushion, the front driver's seat cushion, and the inside of the front passenger door panel. His partner swabbed the steering wheel and swabbed the blood from the seat cushions and interior front door panel. The two officers also processed the car for fingerprints. They did not conduct gunshot residue (GSR) testing because, after speaking with the detectives, there was no indication that any areas should be tested for GSR. Ryan would not expect to find GSR inside the car if a gun were fired from outside the vehicle. The officers also did not conduct GSR testing on Culverson's hands. Ryan did not recover any cartridge casings or bullet fragments in the car. If a semiautomatic weapon or a gun with a clip were fired inside the car, Ryan would expect to see a casing unless the gun became jammed during firing.

¶ 25 Melissa Nally, a forensic scientist with the Illinois State Police crime lab and firearm identification expert, testified that she examined the bullet retrieved from Culverson's body. The bullet was consistent with having been fired from a semiautomatic pistol.

¶ 26 Debra McGary, a forensic scientist with the Illinois State Police forensic science center and expert in the field of fingerprint identification, testified that only some of the latent prints she received were suitable for comparison. Those impressions were not made by defendant.

¶ 27 Debra Klebacha, a forensic scientist at the Illinois State Police forensic science center and expert in the area of forensic biology, testified that she swabbed the driver's side air bag and preserved it for deoxyribonucleic acid (DNA) analysis. The parties stipulated that Ron Ryan, an investigator with the Cook County State's Attorney's office, would testify that he obtained defendant's DNA sample through a buccal swab. The parties further stipulated that Janice Youngsteadt, a forensic scientist in the forensic biology DNA section of the Illinois State Police, forensic sciences command who would be qualified as an expert in the field of forensic DNA analysis, would state that she compared defendant's buccal swab to the DNA extracted from the driver's side air bag and defendant could not be excluded from having contributed to the DNA sample found on the air bag. Katrina Gomez of the Illinois State Police forensic science center, an expert in the area of DNA analysis, also testified that she compared the DNA data from the air bag to defendant's DNA data and determined defendant could not be excluded as having contributed to the major human DNA profile on the air bag.

¶ 28 Detective Brian Forberg testified that he and Detective James Butler were assigned to investigate Culverson's homicide on August 30, 2008. On September 1, 2008, Forberg and his partner, Detective Kevin Eberle, drove the various routes that Culverson could have taken from his sister's home at 827 East Bowman to the accident site. Each route took the officers approximately 20 to 25 minutes to drive. Forberg also reviewed the footage of seven to nine police observation device (POD) cameras along routes that Culverson could have taken from his sister's home to the accident location from between 9 and 9:30 p.m. He did not see Culverson's car on any of the cameras. However, Forberg testified that the cameras rotate, and thus, they cannot catch every portion of the street at a particular time.

¶ 29 On September 2, 2008, Mays provided Forberg with a physical description of the driver of the car. On September 26, 2008, Katrina Gomez told Forberg that she had obtained defendant's

DNA profile from the air bag. Thereafter, Forberg obtained a picture of defendant, which he showed to Culverson's family members. None of them knew defendant.

¶ 30 Forberg testified that he and Eberle interviewed Mays and showed her a photo array on November 13, 2008. The photo array included defendant's photograph. Mays "tentatively identified" defendant but told Forberg and Eberle that she would feel more comfortable viewing defendant in a lineup. Mays viewed a lineup on November 21, 2008, and identified defendant as the person she saw exiting the driver's side of Culverson's car.

¶ 31 Forberg testified that he interviewed defendant on November 26, 2008. The State entered into evidence a video of Forberg's interview with defendant and published it for the jury. Defendant denied knowing Culverson. When Forberg showed defendant a picture of a car that was the same year, make, and model of Culverson's car, defendant denied ever being in the car.

¶ 32 Forberg acknowledged that he did not know the location or exact time of the shooting. He also did not know whether Culverson was shot inside or outside of his car. Forberg's "operating belief," however, was that Culverson was inside the car when he was shot. He also believed the shooter was not in the car when the shot was fired. If the shooter had been inside the car, Forberg would have expected to find evidence of close range firing on Culverson's body or his clothes. In addition, the nature of Culverson's injuries along the left side of his abdomen indicated that Culverson was in a position that Forberg thought was consistent with the blood smears as well as "trying to move away from the shooter." As to the time of the shooting, Forberg explained that he knew Culverson was shot sometime between 9 and 9:30 p.m., based on what Culverson's family had told him.

¶ 33                                    2. *Defendant's Evidence*

¶ 34 The parties stipulated that if called to testify, Spalliero would testify that she responded to an accident at approximately 9:30 p.m. on August 30, 2008, and that when she first approached Culverson, she administered treatment, and Culverson was conscious during that treatment.

¶ 35 Defendant testified that he was drinking with some friends near 47th Street and Vincennes Avenue during the late afternoon or early evening hours of August 30, 2008. They were drinking and hanging out for about an hour and a half or two hours at the home of Josh, whose last name defendant did not know. The other two friends were named Izo and Big Pawn; defendant did not know Izo's last name and only knew Big Pawn by his nickname.

¶ 36 Defendant testified that he started walking to the train station on 47th Street between Calumet Avenue and Prairie Avenue at around 8:40 or 9 p.m. to go to a reggae club at 66th Street and State Street. When he got off the train at 63rd Street and Vernon Avenue, he went to a liquor store and purchased a 22-ounce container of Budweiser and a half pint of Remy Martin.

¶ 37 Defendant further testified that as he walked south on Vernon Avenue toward 66th Street, he encountered Culverson, who was leaning against his car with the driver's side door open. Defendant did not know Culverson prior to August 30, 2008. The car, which was running, was on Vernon Avenue, at the northwest corner of Vernon Avenue and 64th Street. Culverson was sweating and moaning. Defendant asked Culverson, "man, you good, you cool?" Culverson did not respond. Defendant saw that Culverson was bleeding on his left side. Defendant helped Culverson into the passenger's side of the car by walking him around the front of the car. He

- 6 -

did not ask Culverson any questions. Defendant then grabbed the bottle he had placed on the top of the car and set it on the armrest. The bottle eventually fell into the backseat, and beer spilled out onto the seat.

¶ 38 Defendant testified that he started to drive, making a right onto 64th Street and then a left onto Martin Luther King Drive. Defendant intended to take Culverson to St. Bernard Hospital at 63rd Street or 64th Street and Wells Street. During the drive, he did not ask Culverson if he was okay or what happened. While driving south toward 67th Street, defendant tried to get around a car that was moving slowly. He turned the wheel, lost control, and the car "[h]opped the curb" and "hit the pole." The air bags deployed, and defendant started to get out of the car. After getting out of the car, defendant heard Culverson moaning. He told him to "[b]e cool." Defendant started grabbing the bottles to get out of the car, and Mays pulled up alongside the car. She asked if she could call somebody, and defendant said "don't call the police, call the paramedics." Thereafter, he grabbed the bottles from the car and "got up out of there." Defendant explained that he "didn't want to get caught up with it, get blamed for it" and did not want "to deal with the police." He acknowledged that he had a prior attempted murder conviction.

¶ 39 Defendant testified that he started running up 67th Street to a reggae club at 66th Street and State Street. The next day, he conducted an Internet search and saw on a news website that Culverson had died. He later drove by the scene and saw Culverson's family setting out balloons.

¶ 40 When asked whether he called 911, defendant responded that he did not have a phone. The State showed defendant a photograph that showed a phone on the driver's seat of the car at the scene of the accident. However, defendant said that phone could not have been in the seat because he was sitting on the seat. He did not see that phone or use it to call 911.

¶ 41 Defendant further testified that he lied and told the police that he did not know Culverson and did not recognize the car. He thought the police "were trying to be slick" and that while they were questioning him "they were trying to catch [him] up on something." Defendant said that before he went into the interview room, the detectives asked him whether he had a conscience and "stuff like that." The following colloquy ensued:

"[ASSISTANT STATE'S ATTORNEY]: So you were planning on taking this gunshot victim into the hospital, correct?

[DEFENDANT]: Yes.

[ASSISTANT STATE'S ATTORNEY]: You weren't worried answering questions or being blamed for it at that point?

[DEFENDANT]: If he would have got help, he would be able to tell everyone it wasn't me. It would be a whole lot easier that way. Somebody dead, I am on my own.

[ASSISTANT STATE'S ATTORNEY]: He was still alive and conscious when you left him.

[DEFENDANT]: I didn't want to stick around and talk to the police?

[ASSISTANT STATE'S ATTORNEY]: Right. Because in fact, you are saying that you told him, you're saying you told him you'll be okay or stay cool or words to that effect, correct?

[DEFENDANT]: Yes.

[ASSISTANT STATE'S ATTORNEY]: You actually told him that if he said anything you would kill his family, didn't you?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[ASSISTANT STATE'S ATTORNEY]: Did you?

[DEFENDANT]: No.

[ASSISTANT STATE'S ATTORNEY]: No?

[DEFENDANT]: I don't even know his family. How am I going to kill his family.

[ASSISTANT STATE'S ATTORNEY]: That's why I'm asking you did you say that to him?

[DEFENDANT]: No."

¶ 42 Defendant acknowledged that he had the police reports and grand jury transcript for two years, which included Mays' testimony. He did not have the transcripts when he lied to the police on November 26, 2008.

¶ 43                               3. *The State's Rebuttal Evidence*

¶ 44 In rebuttal, Detective Forberg testified that driving south at 6690 South Martin Luther King Drive would be driving in the opposite direction of St. Bernard Hospital. He said the quickest route to St. Bernard Hospital, if one were parked on Vernon Avenue between 63rd and 64th Streets, would be to drive west on 64th Street to Martin Luther King Drive, drive north on Martin Luther King Drive, and then drive west on 63rd Street. However, he acknowledged that one could take 67th Street to reach St. Bernard Hospital.

¶ 45 Forberg did not find any blood on the driver's side of the car's exterior, either on the door or in the frame. The State asked Forberg whether he ever found blood "anywhere on the exterior of the car where say somebody who would have been holding their sides and struggling to get around the car and bleeding on their hands would have gotten blood on the car, did you find any blood anywhere on the exterior of the car?" Forberg responded, "No. The car, as I said in my report, was very clean."

¶ 46                               4. *Closing Arguments and Verdict*

¶ 47 Following the presentation of evidence, the matter proceeded to closing arguments. During its argument in rebuttal, the State made the following assertion:

"You're going to get an instruction and [defense counsel] covered it in his closing, evidence of a defendant's previous conviction of an offense may be considered by you only as it may affect his believability as a witness and must not be considered by you as evidence of his guilt of the offense with which he is charged.

And I agree with [defense counsel]. What that means is when you go back there, you heard he is a convicted felon. A convicted felony [*sic*] for attempted murder. You can't go back to that jury room—what the instruction says, you can't go back to that jury room and say well, he is a bad guy, he committed that back then so he must have committed it this time. You can't do that.

What you can do and what you should do and what this law says, it affects his credibility. You go back there and you say well, he is a convicted felon. He is a convicted felon of attempted murder.

Convicted felons are not believable. They will tell you anything to get away with it, to try and get away with it. That's what felons do. That's why this law exists, because it does affect their credibility.

So he is an admitted liar. His credibility is affected by the fact that he's a convicted felon with an attempt murder conviction."

Later, the State also asserted that defendant was "a liar, admitted liar, proven liar. Can't believe him because of his convicted felony."

Following deliberations, the jury found defendant guilty of first degree murder.

¶ 48                           C. Posttrial Motion and Sentencing

¶ 49       Defendant filed an amended motion for new trial in which he argued, *inter alia*, that the trial court erred by denying his motion *in limine* regarding Culverson's statements to Spalliero. Defendant also posited that the State acted improperly when, "during closing statement," it asserted that defendant threatened to kill Culverson's family if Culverson named defendant as the person who shot him. Following a hearing, the court denied defendant's motion and sentenced him to 50 years in prison.

¶ 50       This appeal followed.

¶ 51                                   II. ANALYSIS

¶ 52       On appeal, defendant argues (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the State committed reversible error by asking during cross-examination whether he threatened to kill Culverson's family if Culverson told police that defendant shot him, where the State had no basis to ask that question and there existed no possibility of proving up that accusation; (3) the trial court should have admitted statements Culverson made to a paramedic on the scene as either dying declarations or excited utterances; and (4) the court erred by allowing the State to use defendant's prior attempted first degree murder conviction for impeachment purposes.

¶ 53       As they are dispositive, we turn first to defendant's arguments that (1) the State committed reversible error when it asked during cross-examination whether defendant threatened to kill Culverson's family if Culverson identified defendant, even though the State had no evidence to support its accusation, and (2) the court erred by allowing the State to introduce his prior attempted murder conviction.

¶ 54                           A. The State's Cross-Examination

¶ 55       Initially, the parties dispute whether defendant forfeited his contention regarding the State's improper cross-examination by failing to raise it in his posttrial motion. To preserve an issue for review, a defendant must both object at trial and raise the issue in a written posttrial motion. *People v. Thompson*, 238 Ill. 2d 598, 611 (2010). In his posttrial motion, defendant argued that the State improperly asserted during closing argument that defendant threatened to kill Culverson's family, not that it made such an assertion during cross-examination. Accordingly, the State posits that defendant forfeited review of his claim. Defendant responds

he properly preserved the issue, notwithstanding counsel's misstatement in the posttrial motion. In the alternative, defendant argues we should review the matter under the plain-error doctrine.

¶ 56    We agree with defendant that he properly preserved the issue of the State's improper cross-examination, even though he mistakenly wrote in his posttrial motion that the State's improper commentary occurred during closing argument instead of cross-examination. A posttrial motion must alert the trial court to an alleged error with enough specificity to give the court the reasonable opportunity to correct it. *People v. Coleman*, 391 Ill. App. 3d 963, 971 (2009). Here, defendant's posttrial motion argued that the State "during closing statement improperly, stated that defendant threatened to kill the victim's family if the victim named the defendant. There was no evidence of that threat presented at trial." This statement was specific enough to alert the court that defendant was challenging the prosecutor's insinuation that defendant threatened Culverson's family, even though the motion incorrectly stated the insinuation occurred during closing argument. Accordingly, we decline to apply forfeiture.

¶ 57    We turn then to the merits of defendant's claim. "It is improper for the prosecutor to ask a witness questions for purposes of impeachment unless the prosecutor is prepared to offer proof of the impeaching information." *People v. Olinger*, 112 Ill. 2d 324, 341 (1986). Thus, the State must possess "a good-faith basis to ask the cross-examination questions, as well as the intent and the ability to complete its impeachment." *People v. Williams*, 204 Ill. 2d 191, 212 (2003).

¶ 58    Here, in the context of questioning the plausibility of defendant's version of events, the State asked defendant whether he threatened to kill Culverson's family if Culverson said anything about defendant. However, there is nothing in the record to suggest the State had the intent or ability to complete its impeachment and show that defendant did in fact make such a threat to Culverson. Indeed, the only other person who could have testified to this alleged threat was Culverson, who was deceased at the time of trial. Culverson's statements before dying were extensively examined at a pretrial hearing, and there was no evidence to suggest he told anybody defendant threatened to kill his family. In short, there was simply no evidence whatsoever to support the State's question. Accordingly, the State's questioning was clearly improper.

¶ 59    Because defendant properly preserved review of the State's improper cross-examination, we turn to whether the error was harmless. See *People v. Boand*, 362 Ill. App. 3d 106, 132 (2005) (improper cross-examination is not reversible error where it can be considered harmless error (citing *People v. Enis*, 139 Ill. 2d 264, 296 (1990))). The incomplete impeachment of a witness is reversible error only when the unfounded insinuation is substantial, repeated, and definitely prejudicial. *People v. Adams*, 283 Ill. App. 3d 520, 526 (1996).

¶ 60    Here, there were no witnesses to the actual shooting. Further, while it was undisputed that defendant was the driver of the car, he offered an explanation for his presence in the car. Accordingly, the jury's verdict in this case rested heavily on whether it found defendant's testimony credible, elevating the significance of the State's insinuation. See *People v. Robertson*, 198 Ill. App. 3d 98, 107-08 (1990) (concluding the State's repeated, unsupported insinuations, during a bench trial, constituted reversible error where the State repeatedly erred in its impeachment of the defense witnesses and the trial court commented that the "the issue really boil[ed] down to the creditibility [*sic*] of the witnesses"; the prosecutor's improper impeachment technique materially contributed to the court's finding that the witnesses lacked credibility). In addition, the State's questioning occurred just after defendant admitted lying to

the police. Further, after defendant denied threatening Culverson, the State asked, "No?" The timing of the State's question and its response of "No?" had the combined effect of implying that defendant was lying when he claimed he did not threaten Culverson. In addition, the State then persisted in its questioning after defendant stated he did not know Culverson's family, asking, "That's why I'm asking you did you say that to him?"

¶ 61 As the State notes, defendant admitted that he lied to the police and that he was a convicted felon, both of which damaged defendant's credibility. However, defendant provided an explanation for lying to the police, testifying he did not want to be blamed for the crime. Given that he had a prior felony conviction, defendant's explanation that he wanted to avoid the police could have been believed by the jury. Further, the nature of the State's accusation in this case—that defendant threatened to kill Culverson's family—was so outrageous that it colored the entire trial. As the State's insinuation was repeated, substantial, and certainly prejudicial, we must reverse.

¶ 62 B. Defendant's Prior Attempted Murder Conviction

¶ 63 Defendant also argues the trial court erred by allowing the State to enter into evidence his prior conviction for attempted first degree murder, as the prejudicial effect of his conviction outweighed its probative value. Defendant argues his 2008 theft conviction, as reflected on his presentence investigation report, would have more appropriately spoken to the veracity of his testimony. Further, he observes the State did not present a motive for his murder of Culverson. He suggests that admitting the attempted murder conviction eliminated the need for the State to explain its theory of unusual events because after the jury heard he had tried to kill somebody else, "the present case simply became a case in which [defendant] succeeded in what he had previously attempted to do." Defendant maintains that he was further prejudiced by the admission of his conviction because the State repeatedly reminded the jury of the conviction during closing argument.

¶ 64 Pursuant to *People v. Montgomery*, 47 Ill. 2d 510, 516 (1971), a prior conviction is admissible to attack a witness's credibility where (1) the prior crime was punishable by death or imprisonment for more than a year or involved dishonesty or a false statement; (2) the prior conviction is less than 10 years old, or the witness was released from confinement within the last 10 years; and (3) the probative value of admitting the conviction outweighs any danger of unfair prejudice. *People v. Mullins*, 242 Ill. 2d 1, 14 (2011). In conducting its balancing test, the trial court should consider, among other things, the nature of the prior conviction, the length of the witness's criminal record, the witness's age and circumstances, "and, above all, the extent to which it is more important to the search for truth in a particular case for the jury to hear the defendant's story than to know of a prior conviction." (Internal quotation marks omitted.) *People v. Cox*, 195 Ill. 2d 378, 383 (2001). " '[S]imilarity alone does not mandate exclusion of the prior conviction,' " particularly where the jury is instructed to consider the defendant's prior conviction only for impeachment purposes. *Mullins*, 242 Ill. 2d at 16 (quoting *People v. Atkinson*, 186 Ill. 2d 450, 463 (1999)). However, trial courts should be cautious in admitting prior convictions for the same crime as the crime charged. *Atkinson*, 186 Ill. 2d at 463. The determination as to the admissibility of a conviction for impeachment purposes is within the trial court's discretion. *Mullins*, 242 Ill. 2d at 15. We review the trial court's decision to admit evidence of defendant's prior convictions for impeachment purposes for an abuse of discretion. *Atkinson*, 186 Ill. 2d at 461-62 (and cases cited therein).

¶ 65     On the facts before us, we conclude the trial court abused its discretion by admitting defendant's prior attempted murder conviction and allowing the State to emphasize that conviction repeatedly during closing argument. At the outset, we note, although defendant argues his 2008 theft conviction would have more appropriately spoken to the veracity of his testimony, defendant did not make such an argument in the trial court. Instead, defendant's argument during the pretrial hearing was that allowing the jury to hear that his prior conviction was for attempted murder would prejudice defendant. Accordingly, defendant asked that the jury not hear the nature of his conviction. The State's motion to allow use of defendant's prior conviction sought only to introduce defendant's attempted murder conviction. Thus, the record does not show the court was even aware of defendant's theft conviction at the time it determined his prior attempted murder conviction should be admitted. Accordingly, to the extent defendant suggests the court should have admitted his theft conviction instead of his attempted murder conviction, that suggestion is unpersuasive.

¶ 66     Nonetheless, we agree with defendant that the prejudicial effect of his attempted murder conviction outweighed its probative value, particularly in light of the State's comments during closing argument. First, we note that defendant's prior conviction for attempted murder was nearly identical to the murder charge for which he was on trial. We recognize that " 'similarity alone does not mandate exclusion of the prior conviction' " (*Mullins*, 242 Ill. 2d at 16 (quoting *Atkinson*, 186 Ill. 2d at 463)) and that the supreme court has found no abuse of discretion even when the trial court admits a prior conviction for the same crime for which the defendant is on trial. See *Mullins*, 242 Ill. 2d at 15, 19; *Atkinson*, 186 Ill. 2d at 458. However, our supreme court has also stated that trial courts should be cautious in admitting prior convictions for the same crime as the crime charged. *Atkinson*, 186 Ill. 2d at 463.

¶ 67     Further, the State's comments in this case encouraged the jury to focus on defendant's prior conviction rather than the facts of the case. On this point, we are guided by our court's decision in *People v. Pruitt*, 165 Ill. App. 3d 947 (1988). There, the defendant was charged with armed robbery and unlawful restraint which involved allegations that the defendant threatened rape. *Id.* at 952-53. At trial, the State introduced into evidence the defendant's prior convictions for rape, deviate sexual assault, armed robbery, and aggravated kidnapping. *Id.* at 952. During closing argument, the State commented that evidence of the defendant's prior convictions could only be considered in determining whether the defendant was believable as a witness. *Id.* at 951. However, the State also noted that the defendant was " 'a convicted felon' " and " 'convicted rapist, armed robber, kidnaper [*sic*] and practitioner of deviate sexual assault.' " *Id.* In addition, the State emphasized the defendant's convictions in other parts of its closing, making such comments as " '[y]ou can't use that conviction' " for " 'the purpose of saying well he did it before therefore he must have done it' " and characterizing the defendant as " 'an accomplished lier [*sic*]' " who " 'lies for the sake of lying.' " *Id.*

¶ 68     On appeal, the *Pruitt* court reviewed the *Montgomery* decision and noted a decision cited by *Montgomery*, *Gordon v. United States*, 383 F.2d 936, 941 (D.C. Cir. 1967). The *Pruitt* court observed that in *Gordon*, the court found a defendant's larceny conviction was properly admitted in the defendant's trial for robbery and assault because the verdict in that case turned on how the jury resolved the credibility contest between the complainant and the defendant and in such situations, " 'there was greater, not less, compelling reason for exploring all avenues which would shed light on which of the two witnesses was to be believed.' " *Pruitt*, 165 Ill. App. 3d at 952 (quoting *Gordon*, 383 F.2d at 941). The *Gordon* court also noted, however, that

- 12 -

strong reasons existed for excluding convictions of the same crime for which the defendant was charged "because of the inevitable pressure on lay jurors to believe that 'if he did it before he probably did so this time.' " *Gordon*, 383 F.2d at 940.

¶ 69 The *Pruitt* court observed that, like the verdict in *Gordon*, the verdict in the defendant's case turned on how the jury resolved the credibility contest between the defendant and the complainant. *Pruitt*, 165 Ill. App. 3d at 952. Nonetheless, the court also noted that the defendant's prior convictions were the same or similar to those for which he was on trial. *Id.* The court went on to state as follows:

> "We believe under the circumstances that admission of these prior convictions clearly created an inevitable pressure on the jurors to believe that if defendant committed these crimes before he probably did so this time, notwithstanding the State's admonishment to the contrary. In fact, we are of the opinion that by the State's admonishment to the jury, that defendant's convictions were only to be considered for impeachment purposes, the State caused the jury to focus its attention on the prior convictions and the probability that he had once again committed the crimes with which he was charged. In effect, admission of defendant's past convictions rose to the level of proof to show defendant's propensity to commit a crime [citation] or similar crimes, which is highly improper. The result was not only to conceivably inflame the jury's passions, but also to cause a search for the truth based upon defendant's prior convictions rather than solely on the facts of the case and the credibility of the witnesses." *Id.* at 953.

Accordingly, the *Pruitt* court held the prejudicial effect of the defendant's prior convictions outweighed their probative value on the issue of the defendant's credibility and that the court committed reversible error by admitting those convictions into evidence. *Id.*

¶ 70 As in *Pruitt*, here, the State repeatedly emphasized defendant's prior conviction during closing argument. Although the State instructed the jury that it could only consider defendant's conviction for impeachment purposes, it specifically pointed out that defendant had a prior conviction for attempted murder no less than three times. By repeating that defendant was a convicted felon and by emphasizing that this conviction was for attempted murder, the State's comments actually encouraged the jury to focus on that prior attempted murder conviction rather than the facts of the case and convict the defendant on the basis of his prior conviction instead of the evidence presented at trial. In other words, as in *Pruitt*, the State's comments here "created an inevitable pressure on the jurors to believe that if defendant" committed attempted murder in the past, he probably committed murder in this case. *Pruitt*, 165 Ill. App. 3d at 953. Accordingly, we conclude the prejudicial effect of the admission of defendant's prior conviction outweighed its probative value and that the admission of that conviction amounted to reversible error.

¶ 71                                        C. Sufficiency of the Evidence

¶ 72 Defendant also argues that the evidence was insufficient to sustain his conviction. Although we are reversing his conviction based on the State's insinuation and the improper admission of defendant's prior conviction, we must consider the sufficiency of the evidence to determine whether retrial is barred by double jeopardy. See *People v. Willis*, 349 Ill. App. 3d 1, 23 (2004). The double jeopardy clause forbids a second trial for the purpose of affording the prosecution another chance to present evidence it failed to present in the first proceeding. *People v. Olivera*, 164 Ill. 2d 382, 393 (1995). However, it does not preclude a second trial

- 13 -

where a defendant's conviction has been set aside because of an error in the proceedings leading to his conviction. *Id.* "If the evidence presented at the first trial, including the improperly admitted evidence, would have been sufficient for any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt, retrial is the proper remedy." *People v. McKown*, 236 Ill. 2d 278, 311 (2010). "The weight to be given the witnesses' testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact." *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006).

¶ 73    Defendant argues the evidence was insufficient to sustain his conviction because the State failed to prove that he shot Culverson. However, we conclude a rational trier of fact could have found defendant shot Culverson based on the totality of the evidence presented. First, it was undisputed that defendant was the driver of the car. Further, based on Latunya's testimony that Culverson dropped her off at her home at around 9 p.m. and Mays' testimony that she observed the car crash at around 9:25 p.m., the evidence showed Culverson was shot between approximately 9 and 9:30 p.m.[2] While Forberg could not find Culverson's car in any of the seven to nine POD cameras along the possible routes Culverson could have taken, Forberg also testified those cameras rotate. In addition, the nature of Culverson's wounds on his hand and abdomen, combined with the fact that a semiautomatic weapon bullet was found in Culverson's body but no bullets or shells were recovered in the car and there was no evidence of close range firing, tended to show Culverson was shot from outside of the car.

¶ 74    Moreover, Mays testified that when she offered to call an ambulance, defendant specifically instructed her to call the paramedics but not the police. Further, before the paramedics or police arrived, defendant collected items from the car and ran from the scene. Notably, defendant also lied to the police during his interview, denying that he knew Culverson or that he was ever in his car. Defendant also acknowledged that by the time he testified and admitted to being in Culverson's car, he had possession of Mays' grand jury testimony for over two years, suggesting he could have tailored his testimony at trial to match Mays' testimony. Based on his presence in the car and the evidence demonstrating his consciousness of guilt, a rational jury could have found defendant guilty of Culverson's murder.

¶ 75    In arguing the evidence was insufficient to sustain his conviction, defendant notes he presented an explanation for leaving the scene and lying where he testified he had a felony conviction and did not want to be blamed for Culverson's murder. Nonetheless, the jury could have chosen not to believe defendant's version of events, particularly where defendant's credibility was called into question by his initial lies to the police and his prior conviction. See *McKown*, 236 Ill. 2d at 311 (in determining whether a double jeopardy violation has occurred, we may consider the evidence at the first trial, including evidence improperly admitted). Further, although defendant testified that he found Culverson, bleeding and leaning against the open front passenger door and that he then led Culverson around the front of the car into the

---

[2]During oral argument, defense counsel suggested that People's exhibit No. 44, a map produced by Forberg using Google.com, stated the route from Culverson's sister's home to the accident site would only have taken 11 minutes. We note the map contains no indication that the 11-minute calculation it shows accounts for traffic. Accordingly, we do not find it to be inconsistent with Forberg's testimony that the routes he drove from Culverson's sister's home to the accident site took 20 to 25 minutes.

- 14 -

passenger's seat, Detective Forberg testified he did not find blood on the driver's side of the car's exterior, either on the door or in the frame, or anywhere on the exterior of the car. Forensic investigator Ryan testified that he found blood on the interior front *passenger* door panel, not on the driver's side. Forberg also testified that defendant's route to the hospital was not the fastest route. In sum, the State presented evidence contradicting defendant's version of events, from which the jury could have rationally rejected his testimony.

¶ 76 In reaching our determination that the evidence was sufficient, we are by no means suggesting the evidence was overwhelming. Indeed, as we pointed out in discussing the State's improper cross-examination, much of this case boiled down to whether the jury found defendant credible. However, the relevant question in determining whether retrial is permitted is "whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis added.) *People v. Lopez*, 229 Ill. 2d 322, 367 (2008). Further, "[t]he weight to be given the witnesses' testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact." *Sutherland*, 223 Ill. 2d at 242. Much of the evidence in this case hinged on the credibility and weight to be given to the witnesses' testimony, which are matters for the jury, not our court. If the jury in this case found the State's witnesses more credible than defendant, it could have found defendant guilty beyond a reasonable doubt. In other words, viewing the evidence in the light most favorable to the State, we cannot say that no rational trier of fact could have found defendant guilty. Accordingly, remand for retrial is the proper remedy.

¶ 77 Because they are likely to arise on retrial, we will now address defendant's arguments that Culverson's statements to Spalliero should have been admitted under the dying declaration or excited utterance exception.

¶ 78                           D. Culverson's Statements to Spalliero

¶ 79 Defendant posits that the trial court erred by denying his motion *in limine* to admit Culverson's statements to Spalliero that he was not shot and that the driver of the car did not shoot him.

¶ 80 Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Jan. 1, 2011). Due to its lack of reliability, hearsay is generally inadmissible, unless it falls into an exception. *People v. Caffey*, 205 Ill. 2d 52, 88 (2001). Here, defendant argues Culverson's statements to Spalliero fall into two exceptions: the dying declaration exception and the excited utterance exception.[3]

¶ 81                                  1. *Dying Declaration*

¶ 82 Illinois Rule of Evidence 804(b)(2) provides that in a prosecution for homicide, a statement made by a declarant while believing his death was imminent, concerning the cause or circumstances of what he believed to be impending death, is not excluded by the hearsay rule.

---

[3]In his initial brief, defendant argued only that the statement was admissible as a dying declaration. Defendant subsequently filed a supplemental brief asserting the statement should also have been admitted as an excited utterance.

Ill. R. Evid. 804(b)(2) (eff. Jan. 1, 2011). The requirements for a dying declaration are as follows: "(1) the declaration pertains to the cause or circumstances of the homicide; (2) the declarant [has] the fixed belief and moral conviction that death is impending and almost certain to follow almost immediately; and (3) the declarant [has the] mental faculties sufficient to give an accurate statement about the cause or circumstances of the homicide." (Internal quotation marks omitted.) *People v. Ingram*, 382 Ill. App. 3d 997, 1004 (2008). We give deference to a trial court's judgment on whether to admit a statement as a dying declaration, and we will not overturn the court's determination unless it is "palpably against the manifest weight of the evidence." (Internal quotation marks omitted.) *People v. Graham*, 392 Ill. App. 3d 1001, 1005 (2009). A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident. *People v. Hatchett*, 397 Ill. App. 3d 495, 502 (2009).

¶ 83        Defendant contends that the trial court erred by finding Culverson's statements were not dying declarations, as they met all three requirements of a dying declaration. Further, defendant argues the court improperly refused to admit Culverson's declaration on the basis that it was not reliable. He maintains the court should not have made credibility determinations or determined the weight of Culverson's statements, as those were matters for the jury.

¶ 84        The trial court's determination that Culverson's statements were not dying declarations was not against the manifest weight of the evidence. As previously detailed, one of the requirements for a statement to be admitted as a dying declaration is that the declarant must possess mental faculties sufficient to provide an accurate statement about his homicide. See *Ingram*, 382 Ill. App. 3d at 1004. Yet, Culverson initially denied having been shot, even though he clearly had been. "In determining whether a declarant possessed mental competency to give an accurate statement, a trial court may consider whether he was able to answer questions about the incident." *Hatchett*, 397 Ill. App. 3d at 504. Thus, in *Hatchett*, the appellate court concluded the trial court could find that the deceased possessed sufficient mental faculties to give accurate statements where the deceased understood all of the sergeant's open-ended questions and answered them promptly and coherently. *Id.* at 497, 504-05. Likewise, in *People v. Davis*, 93 Ill. App. 3d 217, 233 (1981), the appellate court rejected the defendant's claim that the deceased lacked sufficient mental facilities, noting the deceased answered a witness's questions "promptly and accurately and thus understood what was said to him and what he said to [the witness]." By contrast, in this case, Culverson did not correctly answer the question of whether he had been shot, suggesting he lacked sufficient mental faculties to provide an accurate statement. Thus, the trial court's determination that Culverson's statement was not a dying declaration is not against the manifest weight of the evidence.

¶ 85        In so concluding, we reject defendant's assertion that the trial court improperly refused to admit the statement as a dying declaration based on its "unsupported belief" that defendant shot Culverson and Culverson was afraid of defendant. In support of his assertion, defendant relies on the court's statement that it did "not believe that there is reliability, nor is there a situation where the statements were made to assist the police in their investigation of getting a known offender off the streets." He further notes that, at the first hearing on his motion *in limine*, the court made the following statement. "Counsel, how about the fact [that Culverson] is so scared of [defendant] he won't admit he was shot let alone the man driving the car shot him? I mean you're putting in statements. You want to put in statements by a man who is suffering gunshot wounds that won't even tell a paramedic that he's been shot."

¶ 86　　The trial court's comments do not convince us that the court's refusal to admit the statements as dying declarations was improper. As previously detailed, the evidence supported a finding that the requirements for a dying declaration were not met. Further, we perceive the court's comment regarding the "reliability" of Culverson's statement as a commentary on whether Culverson possessed sufficient mental capability to make the statement. The court stated "the reliability is questioned" because Culverson "had an obvious gunshot wound" and "either was unsure of the question or was unaware of the fact that he had been shot." Notably, at a posttrial hearing, the court explained that "this was a conversation, and the evidence is clear that it was a conversation with a man who was not of his right mind. The first question was have you been shot. Response, no. This is not a dying declaration, it's not at [*sic*] excited utterance, and it's certainly not a statement made to medical personnel for the purpose of treatment or diagnosis. He clearly had been shot, he said he wasn't shot, and he died later at the hospital." Thus, the court's comments regarding the "reliability" of Culverson's statements were indicative of the court's belief that Culverson was "not of his right mind" and do not show the court denied the motion *in limine* based on its own assessment of Culverson's credibility.

¶ 87　　Further, there was no testimony at trial that Culverson held "the fixed belief and moral conviction that [his] death [was] impending and almost certain to follow almost immediately." (Internal quotation marks omitted.) *Ingram*, 382 Ill. App. 3d at 1004. Culverson had been shot, complained of and exhibited labored breathing, and became nonresponsive shortly after Spalliero's contact with him. However, the fact that Culverson denied being shot makes it unclear whether he even knew of his injury, much less that he believed his death was imminent. There was no evidence that Culverson made any statements indicating he believed his death was imminent. Further, when the State asked Spalliero, "you never told Mr. Culverson that he was going to die soon, did you?" Spalliero responded, "There's no way I can know that for sure." This testimony failed to establish Spalliero did, in fact, tell Culverson he was going to die soon. Based on the foregoing, the court did not err by refusing to admit Culverson's statement as a dying declaration.

¶ 88　　　　　　　　　　　　　　　　　2. *Excited Utterance*

¶ 89　　Defendant also posits that Culverson's statement was admissible as an excited utterance. He acknowledges that he did not initially seek admission of Culverson's statements under the excited utterance exception. However, he posits the issue is not forfeited, as the trial court considered the excited utterance exception both before and after trial. In the alternative, defendant argues that we should review the matter under the plain-error doctrine.

¶ 90　　We need not resolve the issue of whether defendant forfeited his contention, because whether we find he preserved his claim or whether we review his claim under the plain-error doctrine, we conclude no error occurred. See *People v. Eppinger*, 2013 IL 114121, ¶ 19 (the first step in plain-error review is to determine whether error occurred).

¶ 91　　Illinois Rule of Evidence 803(2) provides that an excited utterance is not excluded by the hearsay rule. Ill. R. Evid. 803(2) (eff. Apr. 26, 2012). An "excited utterance" is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *Id.* Our supreme court has explained the rationale behind the spontaneous declaration or excited utterance rule as follows:

" 'The admissibility of such exclamation is based on our experience that, under certain external circumstances of physical or mental shock, a stress of nervous excitement may be produced in a spectator which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, rather than reason and reflection, and during the brief period when consideration of self-interest could not have been fully brought to bear, the utterance may be taken as expressing the real belief of the speaker as to the facts just observed by him.' " *People v. Damen*, 28 Ill. 2d 464, 471 (1963) (quoting *Keefe v. State*, 72 P.2d 425, 427 (Ariz. 1937)).

¶ 92 For a statement to qualify as an excited utterance or spontaneous declaration, three requirements must be satisfied: "there must be an occurrence sufficiently startling to produce a spontaneous and unreflecting statement, there must be an absence of time for the declarant to fabricate the statement, and the statement must relate to the circumstances of the occurrence." *People v. Sutton*, 233 Ill. 2d 89, 107 (2009).[4] In analyzing whether a statement is spontaneous, excited, and unreflecting, courts consider several factors, such as time, the nature of the event, the mental and physical condition of the declarant, and the presence or absence of self-interest. *People v. House*, 141 Ill. 2d 323, 382 (1990). The period of time that may pass without affecting the admissibility of a statement varies greatly, and the "critical inquiry" with respect to time is "whether the statement was made while the excitement of the event predominated." (Internal quotation marks omitted.) *Sutton*, 233 Ill. 2d at 107.

¶ 93 We review the trial court's determination regarding the excited utterance exception for an abuse of discretion. *People v. Stiff*, 391 Ill. App. 3d 494, 501 (2009). An abuse of discretion occurs only where the court's ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the court's view. *People v. Connolly*, 406 Ill. App. 3d 1022, 1026 (2011).

¶ 94 Defendant argues Culverson's statements were admissible as excited utterances because they related to startling events, *i.e.*, a shooting and car accident, while Culverson was under the stress and excitement caused by those events. He notes that our appellate court has stated the admissibility of an excited utterance does not come from the reliability of the declarant but, rather, from the circumstances under which the statements are made. See *People v. Cherry*, 88 Ill. App. 3d 1048, 1052 (1980). Defendant posits that even though Culverson incorrectly answered Spalliero's question about whether he had been shot, the circumstances show he was under physical and mental shock from the shooting and car accident. He notes Culverson made the statements while on the verge of death, less than 30 minutes after the shooting and car accident, and while experiencing labored breathing. Defendant also posits that Culverson lacked a motive to deliberately mislead Spalliero. In sum, he maintains that the statements were admissible, and it was for the jury to determine the weight to be given to the statements.

¶ 95 The trial court did not abuse its discretion in determining Culverson's statements were not excited utterances. Although Culverson made his statements within 30 minutes of the shooting and the car accident and shortly before losing consciousness, the fact that he initially made an

---

[4]The exception is referred to interchangeably as the spontaneous declaration and excited utterance exception. See, *e.g.*, *House*, 141 Ill. 2d at 381.

- 18 -

inaccurate statement suggests that (1) the shooting and car accident were not sufficiently startling to produce an unreflecting statement or (2) there was sufficient time for Culverson to fabricate the statement. In other words, if Culverson was so disoriented as to be unaware that he was shot, then clearly he was not making his statements "while the excitement of the event predominated." (Internal quotation marks omitted.) *Sutton*, 233 Ill. 2d at 107. Or, if Culverson was aware that he was shot but intentionally claimed that he was not, his ability to lie shows enough time had passed to allow him to fabricate the statement. Either way, the inaccuracy of Culverson's initial statement clearly calls into question the reliability of his statement that defendant did not shoot him. Yet, the excited utterance exception is based on the idea that when a statement is made "under certain external circumstances of physical or mental shock, a stress of nervous excitement may be produced in a spectator which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock." (Internal quotation marks omitted.) *Damen*, 28 Ill. 2d at 471. Given the unreliability of Culverson's statements, we find no abuse of discretion in the court's determination that Culverson's statements were not excited utterances.

¶ 96 In support of his claim that the trial court should have left it up to the jury to decide the weight to give Culverson's statements, defendant relies on *United States v. Davis*, 577 F.3d 660, 669-70 (6th Cir. 2009). There, a witness testified that she saw the defendant with a gun, she was scared because she believed he had been involved in a recent murder, and she quickly walked away because she felt responsible for the small children in her care. *Id.* at 669. Shortly thereafter, the witness called 911. *Id.* In her call, the witness made certain "exaggerations," stating the defendant had two guns, instead of the one she testified to, and that she saw the defendant 5 minutes earlier, when at trial she testified she saw him 30 seconds to 1 minute earlier. *Id.* The *Davis* court concluded the witness's exaggerations did not preclude the applicability of the excited utterance exception. *Id.* at 669-70. The court noted that " 'a statement that satisfies all of the elements of our test for excited utterances meets the threshold admissibility under Rule 803(2), even though its reliability might be subject to challenge on such grounds as inconsistency with subsequent statements of the speaker's motive to fabricate.' " *Id.* at 669 (quoting *United States v. Hadley*, 431 F.3d 484, 498 (6th Cir. 2005)). The court explained that the witness's exaggerations went to the weight and not the admissibility of the 911 call. *Id.*

¶ 97 We note, initially, that *Davis* is a federal decision, interpreting a Federal Rule of Evidence. Our court is not bound by federal decisions where those decisions are used to support arguments relating to state law. *Sundance Homes, Inc. v. County of Du Page*, 195 Ill. 2d 257, 276 (2001). Further, *Davis* is distinguishable. The witness in *Davis* exaggerated certain facts, whereas Culverson provided a completely inaccurate statement. Defendant also relies on *House*. First, we note, defendant has not cited any portion of the *House* decision in which the supreme court considered whether the inaccuracy of the victim's statement affected its admissibility as an excited utterance. In any event, in *House*, the victim provided a description of her attackers that did not exactly match the defendant's description. The *House* victim described one of her assailants as 5 feet and 8 or 9 inches tall and fat and the other assailant as 5 feet 7 inches tall and weighing 140 pounds. *House*, 141 Ill. 2d at 352-53. The defendant testified that he was 5 feet 7 inches tall and weighed 180 to 200 pounds. *Id.* at 361. Thus, the *House* victim's description of her assailants varied slightly from the defendant's actual

description; however, the *House* victim did not make a wholly inaccurate statement like Culverson. Accordingly, the same concern regarding the spontaneity and reliability of Culverson's statement was not implicated in *Davis* or *House*.

¶ 98     For the reasons stated, we conclude the trial court's finding that Culverson's statement was not an excited utterance was not arbitrary, fanciful, or unreasonable.

¶ 99                                    III. CONCLUSION

¶ 100     For the reasons stated, we reverse the trial court's judgment and remand for a new trial.

¶ 101     Reversed and remanded.

¶ 102     JUSTICE GORDON, specially concurring.

¶ 103     I must specially concur. Like the majority, I would reverse and remand for a new trial. It is outrageous that an assistant State's Attorney (ASA) would essentially tell the jury that defendant "actually told [the victim] that if he said anything [defendant] would kill his family," when there was absolutely no evidence to support this assertion. The ASA had no clue what was, or was not, said inside the vehicle prior to the arrival of the paramedic, and the ASA made up the statement out of whole cloth. An ASA is clothed with the authority of the State, and the jury assumes that he or she acts with the dignity of that office. That an ASA would completely make up a declaration by a dead victim violates every principle upon which our justice system is based. Once the ASA asked defendant whether he made the statement, the case was over. At that point in time, nothing could have cured the prejudice and there was no way defendant could have received a fair trial.

¶ 104     However, I must write separately because I believe it is important to address, in the alternative, whether the ASA's error rises to the level of plain error and because I believe that the victim's statement qualifies as both a dying declaration and an excited utterance, and it should be admitted at a retrial.

¶ 105                                    I. Not Forfeited

¶ 106     I agree with the majority that the objection is not forfeited. In order to preserve an issue for review, a defendant must both (1) object at trial and (2) raise the issue in a written posttrial motion. *People v. Thompson*, 238 Ill. 2d 598, 611-12 (2010).

¶ 107     First, in the case at bar, the defense counsel objected promptly at trial when the ASA made this statement. A general objection raises the issue of relevance. *People v. Villanueva*, 382 Ill. App. 3d 301, 304-05 (2008). An assertion that is not based on the evidence is completely irrelevant to the issues at trial, and thus, the objection should have been sustained. But, as noted, that could never have cured the outrageous conduct of the ASA.

¶ 108     Second, in his posttrial motion, defendant argued that the State improperly asserted that defendant threatened to kill the victim's family. However, the motion mistakenly stated that this assertion occurred during closing argument rather than during cross-examination. "An issue raised by a litigant on appeal does not have to be identical to the objection raised at trial, and we will not find that a claim has been forfeited when it is clear that the trial court had the opportunity to review the same essential claim." *People v. Lovejoy*, 235 Ill. 2d 97, 148 (2009).

¶ 109    Illinois case law requires specificity in posttrial motions in order to accomplish the following: to allow the trial judge to review his own decisions, to allow the reviewing court to determine whether the trial court has had an adequate opportunity to reassess the allegedly erroneous rulings, and to prevent litigants from stating general objections and then raising issues on appeal that the trial judge was never given an opportunity to consider. *Sheth v. SAB Tool Supply Co.*, 2013 IL App (1st) 110156, ¶ 111 (quoting *Balsley v. Raymond Corp.*, 232 Ill. App. 3d 1028, 1029 (1992)). See also *People v. Coleman*, 391 Ill. App. 3d 963, 971 (2009) ("A posttrial motion must alert the trial court to the alleged error with enough specificity to give the court a reasonable opportunity to correct it.").

¶ 110    While the use of boilerplate language in a posttrial motion without further specificity is not enough to preserve an issue for appeal, there was no boilerplate language used here. See *People v. Jones*, 2015 IL App (1st) 121016, ¶ 106. In the case at bar, defendant identified the specific untruth at issue, and this was sufficient to alert the trial court to the issue. Thus, the issue is not forfeited for our review.

¶ 111                            II. Harmless Error Review

¶ 112    Since the error is preserved, we should apply a harmless error review. The burden of proof is thus on the State to show beyond a reasonable doubt that the error did not affect the outcome of the proceedings. *People v. Mullins*, 242 Ill. 2d 1, 23 (2011). In other words, the inquiry is whether the defendant would have been convicted regardless of the error. *Mullins*, 242 Ill. 2d at 23. To make this determination, we review the record of the proceedings as a whole. *Mullins*, 242 Ill. 2d at 23.

¶ 113                            III. Plain-Error Review

¶ 114    However, even if we were to find that the issue was not preserved, this error would still require reversal under the plain-error doctrine. When an issue is not preserved for our review, we may still review it for plain error. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). However, the " 'burden of persuasion' " switches to the defendant to show that the error rises to the level of plain error. *Piatkowski*, 225 Ill. 2d at 564. Under the plain-error doctrine, we may review an unpreserved issue, either (1) when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) when a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Piatkowski*, 225 Ill. 2d at 565.

¶ 115    Last month, in *People v. Clark*, 2016 IL 118845, our supreme court observed that, "although our decisions" in a couple of prior cases "equated second-prong plain error with structural error, we did not restrict plain error to the [six] types of structural error that have been recognized by the [United States] Supreme Court." *Clark*, 2016 IL 118845, ¶ 46 (discussing *People v. Glasper*, 234 Ill. 2d 173 (2009), and *People v. Thompson*, 238 Ill. 2d 598 (2010)). Thus, second-prong error certainly includes the six categories identified by the United States Supreme Court, but it is not limited to them. The six identified categories of second-prong error are (1) a complete denial of counsel, (2) a biased trial judge, (3) racial discrimination in the selection of the grand jury, (4) a denial of self-representation at trial, (5) a

denial of a public trial; and (6) a defective reasonable-doubt instruction. *People v. Johnson*, 2015 IL App (1st) 141216, ¶ 46.

¶ 116　However, in this appeal, defendant does not ask us to consider the issue under the second prong of the plain-error doctrine,[5] so we will consider it first as harmless error and then, in the alternative, under the first prong of the plain-error doctrine.

¶ 117　　　　　　　　　　　　　　　　IV. Error

¶ 118　The first question under either the plain error or harmless error doctrines is whether any error occurred at all. *Piatkowski*, 225 Ill. 2d at 565 ("the first step" in a plain error analysis is "to determine whether error occurred"); *Mullins*, 242 Ill. 2d at 23-25 (first the court determined that there was an error and then considered whether it was harmless or reversible error).

¶ 119　In *Glasper*, our supreme court held that an improper remark by a prosecutor constituted error. *Glasper*, 234 Ill. 2d at 215.[6] In *Glasper*, the prosecutor argued that the conditions in which defendant were held during his confession "sound[ed] a lot like jury service" and the prosecutor then asked whether the jurors were "ready to confess to a murder [they] didn't commit?" (Internal quotation marks omitted.) *Glasper*, 234 Ill. 2d at 214. Our supreme court found this comment constituted error, since "[t]he prosecutor's comment was irrelevant and had no purpose other than to distract the jurors from their duty—assessing the evidence in the case." *Glasper*, 234 Ill. 2d at 215.

¶ 120　Similarly, in the case at bar, the prosecutor's remark had no purpose other than to distract the jurors from their duty to assess the evidence, since it was not based on any actual evidence in the case. However, the remark here was far worse because at least the remark in *Glasper* had some connection to the conditions in which the defendant had been held and could be claimed to be an appeal to the jurors' own experiences, whereas the remark here had no connection to any evidence in the case and could only be misinterpreted by the jurors who had no basis for judging it. After defendant denied threatening the victim, the State followed up with a sarcastic "No?" thereby implying that defendant was lying and the State knew it. This error was plain and obvious. *Piatkowski*, 225 Ill. 2d at 565.

¶ 121　Having now concluded that there was plain, obvious, and—I would say—glaring error, I examine it first under the harmless error doctrine and, in the alternative, under the first prong of the plain-error doctrine.

¶ 122　　　　　　　　　　　　　　　V. Harmless Error

¶ 123　As noted above, in a harmless error analysis, the State has the burden of proving beyond a reasonable doubt that the error did not affect the outcome of the proceedings. *Mullins*, 242 Ill. 2d at 23. The State cannot possibly satisfy this burden in this case.

¶ 124　The undisputed evidence at trial established that defendant drove the victim's vehicle. A bystander testified that the driver and the victim appeared to be conversing inside the victim's

---

[5]Defendant's appellate briefs were filed prior to our supreme court's decision in *Clark*, 2016 IL 118845.

[6]Although the supreme court went on to conclude that the State's evidence was overwhelming and thus reversal was not required, the court still found the remark to constitute error. *Glasper*, 234 Ill. 2d at 215.

vehicle when she arrived and that defendant instructed her to call the paramedics. According to the deputy medical examiner, the victim died of multiple gunshot wounds. A ballistics expert testified that the bullet retrieved from the victim's body was consistent only with having been fired from a semiautomatic pistol. A forensic investigator testified that he did not recover any cartridge casings or bullet fragments inside the vehicle and that, if a semiautomatic weapon or a gun with a clip were fired inside the vehicle, he would normally expect to find a casing in the vehicle. No gunshot residue testing was done on either the vehicle or defendant. One cannot even say that defendant was present at the crime scene, because the evidence did not conclusively establish that the vehicle was the crime scene.

¶ 125　　Although the State is not required to show a motive, no motive was shown, and there was no evidence to link defendant to a gun, to the shooting, to the victim, or to the crime scene—wherever it was—other than defendant's presence next to the shooting victim and his departure after the bystander arrived. Defendant, who was previously convicted of attempted murder, testified that he was nervous that the police would try to pin the shooting on him and thus was not truthful with them about whether he had been in the vehicle. In sum, the evidence was far from overwhelming, and I reach that conclusion without even considering the exonerating statement by the victim himself that *defendant did not shoot him*.

¶ 126　　If we considered, in addition, the completely exonerating statement by the victim, there is simply no way to find this error harmless.

¶ 127　　　　　　　　　　　　VI. Plain Error Under the First Prong

¶ 128　　Although this error was preserved for our review and was not harmless, defendant also asks to consider, as an alternative argument, whether it rose to the level of plain error under the first prong of the plain-error doctrine. For the reasons discussed below, I find that it does.

¶ 129　　Under the first prong of the plain-error doctrine, we will reverse a conviction when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error. *Piatkowski*, 225 Ill. 2d at 565. "Whether the evidence is closely balanced is, of course, a separate question from whether the evidence is sufficient to sustain a conviction on review against a reasonable doubt challenge." *Piatkowski*, 225 Ill. 2d at 566. Thus, evidence may be sufficient but still closely balanced. *Piatkowski*, 225 Ill. 2d at 567 (our supreme court proceeded to consider whether the evidence was closely balanced, after first determining that it was sufficient).

¶ 130　　"The relevant inquiry" for sufficiency purposes is "whether, after viewing the evidence in the light most favorable to the prosecution any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Piatkowski*, 225 Ill. 2d at 566. By contrast, the relevant inquiry under the first prong is whether defendant met his burden to "show that the quantum of evidence presented by the State against the defendant rendered the evidence 'closely balanced.' " *Piatkowski*, 225 Ill. 2d at 566 (quoting *People v. Herron*, 215 Ill. 2d 167, 193 (2005)). "When an error occurs in a close case, we will opt to 'err on the side of fairness, so as not to convict an innocent person.' " *Piatkowski*, 225 Ill. 2d at 566 (quoting *Herron*, 215 Ill. 2d at 193).

¶ 131　　As I explained above, this error was not just plain and obvious but glaring, and the evidence against him was far from overwhelming. As a result, I find that this error was the piece of evidence that tipped the scales of justice against defendant, and we must reverse.

¶ 132    In sum, I conclude that this error was preserved for our review and was not harmless. In the alternative, I find that, even if it was not preserved, it rose to the level of plain error under the closely balanced prong of that doctrine. Either way, we must reverse.

¶ 133                                    VII. Retrial

¶ 134    Since I conclude on this basis alone that reversal is required I do not consider defendant's other claims of error. However, at a retrial, I would permit the introduction of the victim's statement as a dying declaration (Ill. R. Evid. 804(b)(2) (eff. Jan. 1, 2011)), and I would not permit the introduction of defendant's prior conviction for attempted murder since it is more prejudicial than probative. Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 135    Rule 403 of the Illinois Rules of Evidence provides, in relevant part, that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Ill. R. Evid. 403 (eff. Jan. 1, 2011); *Mullins*, 242 Ill. 2d at 15 (a prior conviction "must be excluded" if its probative value is substantially outweighed by its prejudice). Defendant argues that his 2008 theft conviction would have accomplished the stated goal of impeaching his credibility without any prejudice. *People v. Cox*, 195 Ill. 2d 378, 384 (2001) (with admission of prior convictions to impeach credibility, " '[t]he focus' " should be " 'on crimes which bear on the defendant's truthfulness as a witness' " (quoting *People v. Williams*, 161 Ill. 2d 1, 39 (1994))). The question then is whether it is error to admit defendant's 1998 attempted murder conviction when his 2008 theft conviction would accomplish the stated goal of impeaching defendant's credibility. In the case at bar, the ASA stated repeatedly in closing that defendant was convicted of attempted murder. With so little evidence connecting defendant to this victim, defendant's prior conviction for a similar crime became more prejudicial on the issue of guilt than probative on the issue of credibility. *Cox*, 195 Ill. 2d at 384 ("Convictions for the same crime for which defendant is on trial should be admitted sparingly."); *People v. Williams*, 161 Ill. 2d 1, 36 (1994) ("if the evidence is close, a jury is likely to convict the defendant on his past record rather than on the evidence at trial"). Thus, at retrial, I would not allow introduction of the attempted murder conviction. *Williams*, 161 Ill. 2d at 39 ("[t]he focus" should be "on crimes which bear upon defendant's truthfulness as a witness").

¶ 136    In addition, Rule 804(b)(2) provides that the hearsay rule does not bar, "[i]n a prosecution for homicide, a statement made by a declarant while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death." Ill. R. Evid. 804(b)(2) (eff. Jan. 1, 2011). Whether a victim is able to breathe is one of the key facts that courts consider in determining whether a victim knows death may be imminent. *People v. Gilmore*, 356 Ill. App. 3d 1023, 1025, 1034-35 (2005); *People v. Walker*, 262 Ill. App. 3d 796, 801 (1994); *People v. Warren*, 259 Ill. 213, 216 (1913). This is no surprise since poets, for hundreds of years, have equated breath with life and its absence with death. *E.g.*, William Shakespeare, Romeo and Juliet, act 5, sc. 3 ("Death, that hath suck'd the honey of thy breath ***."). While a modern person knows that CPR is an option, he or she also knows that, if a lack of breathing is not arrested quickly, the outcome is not good. In the case at bar, the victim's statement should have been admitted as a dying declaration, after the victim complained to the attending paramedic that he could not breathe and then lost consciousness a few minutes later and died in the ambulance.

¶ 137    The trial court appears to have given little or no weight to the victim's acknowledgement that he could no longer breathe and focused instead on the victim's "no" response to the query

of whether he had been shot. The trial court assumed that a "no" response proved that the victim did not know he had multiple bullet wounds in his own abdomen. However, a "no" response could also be consistent with a bystander incident.[7] A person who was asked whether *he* had been shot could have understood this question to mean whether he was the intended victim or whether he had been shot at. The victim's "no" response would then be consistent with his subsequent "no" to the question of whether defendant was the shooter.

¶ 138    The trial court's assumption conflicted with the manifest weight of the evidence, which showed that the victim knew he could not breathe, that the victim had multiple bullet wounds in his abdomen, and that the victim asserted defendant was not the shooter.[8] See *People v. Lee*, 2012 IL App (1st) 101851, ¶ 25 (while the trial court's factual determinations may be reversed if against the manifest weight of the evidence, the trial court's legal determination is reviewed *de novo*). As a result, I would admit this evidence at the retrial as a dying declaration.

¶ 139    In the alternative, I would find that the statement also qualifies as an excited utterance. Earlier this year, our supreme court set forth the requirements for an excited utterance, as follows: "(1) the occurrence of an event or condition sufficiently startling to produce a spontaneous and unreflecting statement; (2) absence of time to fabricate; and (3) a statement relating to the circumstances of the occurrence." *People v. Lerma*, 2016 IL 118496, ¶ 5 n.1.

¶ 140    In the case at bar, the victim's statement satisfies all three factors mentioned in *Lerma*. First, the victim's realization that he could no longer breathe qualifies as a "condition sufficiently startling to produce a spontaneous and unreflecting statement." *Lerma*, 2016 IL 118496, ¶ 5 n.1. The fact that the statement was made in response to a question does not destroy its spontaneity. *People v. Burney*, 2011 IL App (4th) 100343, ¶ 39 ("That a statement may be made in response to an inquiry does not destroy [its] spontaneity." (citing *People v. Connolly*, 406 Ill. App. 3d 1022, 1025 (2011))). In *Burney*, for example, a deputy sheriff asked a victim what happened, and she replied that a man had forced his way into her house and she provided a description of the man. The appellate court ruled that the fact that the victim "responded to [the deputy's] question as to what happened did not destroy the spontaneity of the statements." *Burney*, 2011 IL App (4th) 100343, ¶ 42. Similarly, in the case at bar, the statement at issue was made in response to questioning by a paramedic. The paramedic asked the victim whether the driver shot him, and the victim responded no. Like the victim in *Burney*, the victim in the case at bar "was still affected" (*Burney*, 2011 IL App (4th) 100343, ¶ 42) by the event or condition, and thus the paramedic's question "did not destroy the spontaneity of the statements." *Burney*, 2011 IL App (4th) 100343, ¶ 42. See also *People v. Damen*, 28 Ill. 2d 464, 470 (1963) (the fact that an officer asked the complainant "what happened" in a rape case was insufficient to destroy the statement's spontaneity).

---

[7]Although there is evidence in the record to suggest the absence of close-range firing, a "no" response could also be consistent with a suicide or accident. A person, who either attempted suicide or had a gun accident and was asked "were you shot," could understand the question as meaning "were you shot by someone" and answer no. No gunshot residue testing was performed on the victim's hands. The "no" response would then be consistent with the victim's subsequent "no" answer to the paramedic's follow-up question of whether the driver shot him.

[8]The State argues that the victim never stated that he was dying nor did the evidence suggest that the paramedic told the victim that he was dying. However, when the State asked the paramedic "[a]nd you never told [the victim] that he was going to die soon, did you," the paramedic responded, "There's no way I can know that for sure."

¶ 141    Second, there was no time to fabricate, between when the victim realized he could no longer breathe and when he made the statement. *Lerma*, 2016 IL 118496, ¶ 5 n.1. According to the paramedic, the victim's labored breathing occurred simultaneously with the victim's denial that defendant shot him. Third, the victim's "statement" that defendant did not shoot him "relat[ed] to the circumstances of the occurrence," namely, the circumstances concerning why he could no longer breathe. *Lerma*, 2016 IL 118496, ¶ 5 n.1. Thus, the statement also qualifies as an excited utterance.

¶ 142    In conclusion, I would reverse and remand for a retrial, and I would admit the dying declaration but not the attempted murder conviction at the retrial.